## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:06-CR-60-TS |
| | ) | |
| ENEDEO RODRIGUEZ, JR. | ) | |

### OPINION and ORDER

Before the Court is a Motion to Suppress [DE 103], filed August 9, 2007, by the Defendant, Enedeo Rodriguez, Jr. The Defendant argues that his Fifth and Sixth Amendment rights were violated when he was coerced into making involuntary, incriminating statements to law enforcement officials, and therefore, those statements should be suppressed.

The government filed a Response [DE 109] on August 24, 2007. An evidentiary hearing was held on October 18, 2007. The Defendant filed a Brief in Support of Defendant's Motion to Suppress [DE 180] on June 13, 2008.[1] The Government responded [DE 183] on July 9, 2008. The Defendant did not file a Reply by July 21, 2008, the scheduled date for such a filing. (*See* Scheduling Order, DE 174.)

### BACKGROUND

This motion and criminal case arise from an investigation of a shipment of about 1000 pounds of marijuana from Brownsville, Texas, to Fort Wayne, Indiana. Agents from Immigration and Customs Enforcement (ICE), a federal agency, and local Indiana law enforcement were involved in the investigation.

---

[1] The long period between the evidentiary hearing and the Defendant's brief in support of his motion is due to the Defendant requesting a new attorney on three occasions. (*See* DE 126, 127, 154, 156, 160, 167, 170, and 171.)

After the drugs arrived in Fort Wayne, agents and police made several arrests on October 18, 2006. For context and background purposes, the Defendants and the roles they played, as alleged by the government, are provided here. Defendant Rodriguez arranged a flight from Texas to Indiana for Defendant Adaberto Guzman (also known as Juaquin Tapia[2]), hosted Guzman at a residence, and drove Guzman around Fort Wayne. (Lievers Affid. 5; DE 1-2 at 6.) Defendant Rodriguez expected to receive about 100 pounds of marijuana for his role in the deal. (*Id.*) Defendant Guzman is alleged to have hired a person to drive the drugs from Texas to Fort Wayne. (*Id.* at 1–2.) Defendant Guzman and Defendant Andres Cuellar (also known as Andres Cuellar-Chavez) gave instructions to the driver, including an order to contact Defendant Jose Hernandez when the driver arrived in Fort Wayne. (*Id.* at 1–2.)

When the drugs arrived, Defendant Hernandez met the driver, and they drove to a home owned by Defendant Jose Ramirez where they unloaded the marijuana. (*Id.* at 2–3.) Defendant Hernandez and the driver left the house and met Defendants Guzman, Cuellar, and Rodriguez at a Fort Wayne restaurant. (*Id.* at 3.) Later that evening, Defendants Hernandez and Ramirez were arrested at the house where the marijuana was stored, and the drugs were seized. Police also arrested the other three Defendants, including Rodriguez, at the restaurant that evening. (*Id.* at 4.)

The Defendants were transported to an Indiana State Police post in the southwest area of Fort Wayne for processing and interrogation. The interactions between the Defendant and law enforcement at that point form the basis of the motion and dispute now before the Court.

---

[2] Defendant Guzman operated under the alias of Juaquin Tapia when he was arrested and for some time while he was in custody. Defendant Guzman eventually admitted that his real name is Adaberto Guzman. (Jan. Hr'g Tr. 63:11–14.)

The Defendant's main claim is that ICE agents Arturo Cantu and Joshua Lievers coerced him into making involuntary, incriminating statements. Specifically, Defendant Rodriguez argues that the agents threatened to arrest and search the home of the Defendant's girlfriend, Monica Garza (also the mother of several of the Defendant's children). The Defendant also testified that he did not knowingly and intelligently waive his rights because of his educational level, he was under the influence of drugs, and what the agents did or did not tell him about the waiver form.

The government argues that the Defendant's allegations of coercion are not true; that is, the agents' allegedly coercive acts did not occur, and therefore the Defendant's waiver of rights was voluntary. Alternatively, the government argues that even if the agents did behave as the Defendant alleged, such conduct does not rise to the level of coercion, so the Defendant's incriminating statements were voluntary and thus admissible.

An evidentiary hearing for this motion was held on October 18, 2007. Also, an evidentiary hearing for Defendant Guzman's Motion to Suppress [DE 125] was held on January 30, 2008. Relevant information from that hearing will be included in this Opinion.

**LEGAL STANDARD**

Before police can conduct a custodial interrogation of a suspect, they must advise him of certain rights and abide by certain procedures. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The rights a suspect must be informed of include the right to remain silent, the right to have an attorney present, and the right to have an attorney who is retained or appointed. *Id.* However, a defendant may waive his *Miranda* rights if "the waiver is made voluntarily, knowingly[,] and

3

intelligently." *Id.* That "inquiry has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Regarding this second aspect, the waiver must be "a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *see also United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001).

Then "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (internal quotations omitted).

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* 422–23. The government has the burden of showing that the waiver was valid by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

"Whether a defendant made a voluntary, knowing[,] and intelligent waiver of his *Miranda* rights is distinct from the issue of whether, under the totality of the circumstances, the challenged statement was involuntary." *Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir. 1996) (quoting *Baskin v. Clark*, 956 F.2d 142, 145 (7th Cir. 1992)).

"A district court may admit a confession into evidence only if the accused made it voluntarily." *Huerta*, 239 F.3d at 871; *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). The "test for a voluntary confession is 'whether the defendant's will was overborne at the time he confessed.'" *United States v. Haddon*, 927 F.2d 942, 945–46 (7th Cir. 1991) (quoting *United States v. Hocking*, 860 F.2d 769, 774 (7th Cir. 1988)). Coercive police activity must be causally related to a confession for it to be involuntary within the meaning of the Fourteenth Amendment. *Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.").

Coercion is examined from the perspective of a reasonable person in the position of the suspect. *Huerta*, 239 F.3d at 871. "A confession is voluntary if, in the totality of the circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Id.* (quoting *Dillon*, 150 F.3d at 757). In looking at the totality of the circumstances, courts have found relevant a defendant's age, education, intelligence, experience with police, and mental state. The length of detention, nature of interrogations, notification of constitutional rights, and use of physical punishment are also relevant. *Id.*; *United States v. Sablotny*, 21 F.3d 747, 750 (7th Cir. 1994). Courts also consider whether consent was immediate or was prompted by repeated requests, and whether the suspect was in custody when he consented. *United States v. Johnson*, 495 F.3d 536, 542 (7th Cir. 2007) (citing *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006)).

Where a defendant claims to have been under the influence of drugs so that voluntary confession was impossible, "[i]t is a balancing test that must be employed: when the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *Haddon*, 927 F.2d at 946. Also, "merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct," and "the police are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *Sablotny*, 21 F.3d at 752–53.

Finally, "[a]n objectively unwarranted threat to arrest or hold a suspect's paramour, spouse, or relative without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements." *United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006). "But a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages." *Id.* Even if a threat to arrest a relative causes a confession, if the arrest "was bona fide and not a pretext to extract a confession" then it would not make the confession inadmissable. *Johnson v. Trigg*, 28 F.3d 639, 644 (7th Cir. 1994) ("The police cannot be penalized for a proper arrest, merely because the arrest serendipitously induces someone else to confess.").

## FINDINGS OF FACT

The evidence presented at the October 18, 2007, and January 30, 2008, evidentiary hearings shows the following to be the relevant credible facts proven by a preponderance of the evidence. *Connelly*, 479 U.S. at 168.

### A.   Defendant Guzman's Testimony

Defendant Guzman was called as a witness at the October 18, 2007, hearing and he testified in Spanish. An interpreter participated by telephone.

Defendant Guzman was the second Defendant interviewed by Agents Cantu and Lievers at the Indiana State Police post. (Tr. 13:12–13.) Defendant Guzman testified that Agent Cantu displayed Garza's driver's license and said that he planned to arrest Garza. (*Id.* at 97:18–23.) Defendant Guzman specified that the agents showed him Garza's actual license and not a photocopy of the license. (*Id.* at 99:23–100:8.) Defendant Guzman also testified that Agent Cantu interviewed him in Spanish (*Id.* at 97:11–17.)

### B.   Defendant Rodriguez's Testimony

#### 1.   *Encounter at the Restaurant*

Defendant Rodriguez testified that both agents spoke with him after he was arrested while they were still at the restaurant. He testified that both encounters took place behind the restaurant.

Defendant Rodriguez said Agent Cantu briefly spoke to him after his arrest while they were still at the restaurant. (*Id.* at 58:7–16.) "Mr. Cantu, um, he told me exactly, can I talk to you? And I

said, I don't have nothing to say.  He goes, you sure? I said, yeah. Anything you have to say to

me can be said amongst everybody. He goes, all right. That was it." (*Id.* at 58:13–16.) Defendant

Rodriguez added that Agent Lievers was

> more aggressive. Mr. Cantu was more mellow. Mr. Lievers was more aggressive. He, he,
> he told me exactly. He says, I will search your house.  Whatever I find, I will nail you to
> that, and he was more aggressive. He was aggressive, and he also, he also told me, you
> got something to say? I said no.

(*Id.* at 59:4–9.) Defendant Rodriguez elaborated:

> They asked me where I lived.  I said I was staying at my sister's house.  I then got
> worried.  I didn't want them to search my house or to bring my family into this. Um, I
> didn't really know how to act, and they noticed that, too. They, they, that is whenever
> they, they presented the driver's license and said they would search my house.

(*Id.* at 60:9–14.) Defendant Rodriguez testified that he had not been given any written or oral

warnings about the right to an attorney or the right to remain silent. (*Id.* at 58:21–25.) He also

testified that he was in handcuffs and not free to leave during the encounters with the agents. (*Id.*

at 59:14–17.)

Defendant Rodriguez testified that Agent Lievers emptied the Defendant's pockets, took

out his wallet, which contained Garza's driver's license, and then asked who Garza was. (*Id.* at

59:24–60:7, 60:9.) Defendant Rodriguez testified that, when the agents showed him Garza's

driver's license at the restaurant and asked him who it was, he told them it was his former

girlfriend (and not his current girlfriend) because "I really didn't want them to search my house

or arrest Monica." (*Id.* at 60:17–23.) He testified that the agents did not remove photos of

Rodriguez's children from his wallet at the restaurant. (*Id.* at 60:24–61:5.)

### 2.     *Preinterview Period at the State Police Post*

Defendant Rodriguez said that at the Indiana State Police post the Defendants were held in a large room with desks, they were all handcuffed, and that his hands were handcuffed behind his back. (*Id.* at 61:19–62:12, 62:23–24.) Defendant Rodriguez testified that, while he was being held in the large room before his interview, he was not offered anything to eat or drink. (*Id.* at 68:8–13.) He said he had to ask to use the restroom "many times" before the officers allowed him to, and that they responded to his requests with "a snotty attitude." (*Id.* at 68:16–19.) Defendant Rodriguez said the other Defendants were deprived of food, drink, and access to a restroom. (*Id.* at 68:22–69:6.) His handcuffs were removed when he was fingerprinted and then placed back on him in the front. (*Id.* at 62:15–22.) Defendant Rodriguez said that after being fingerprinted he was taken to a room that he believed was a storage room because of the boxes. (*Id.* at 63:3–18.) Agents Cantu and Lievers were the only other persons in the room. (*Id.* at 63:19–23.) His handcuffs remained on in front. (*Id.* at 63:24–25.)

### 3.     *Agents' Interview with Defendant Rodriguez*

Defendant Rodriguez was the third Defendant to be interviewed. He testified that he signed a document on the night of his arrest regarding his rights but he did not understand that he was waiving them. (*Id.* at 64:15–65:3.)

> Q   What do you remember about that piece of paper?
> A   About that piece of paper, I remember it was my rights, and I remember asking Lievers. Lievers was aggressive at this interview, and I remember asking to read. He stated if I understood it, and I said yes.  He pointed right to where he wanted me to sign, so I signed.
> Q   When you signed that, what did you think you were signing?
> A   That I understood my rights, like he had stated.
> Q   Did you know they were asking you to waive or give up those rights?

A   No.  I, I, he wrote that.  I have an eighth-grade level, but I mean, I would have knew what waiving my rights would be.

(*Id.* at 64:17–65:3.)

Defendant Rodriguez testified that he did not recognize his waiver of rights form when it was shown to him during the hearing. (*Id.* at 64:1–3.) At one point, Defendant Rodriguez indicated he recognized that his signature was on the document, but a moment later he said he was not sure:

Q   Your signature?
A   Yes.
Q   Is that, in fact, your signature?
A   I can't say it is, because I don't, I don't do my Rs like that.

(*Id.* at 64:6–10.) Defendant Rodriguez testified that Agent Cantu read the Defendant's rights to him during the interview but that Agent Cantu did not read the rights form that was shown to him in court. (*Id.* at 74:9–11, 74:25–75:1.) Defendant Rodriguez testified that he did not recall signing the form and he did not recall Agent Cantu going over the form line by line. (*Id.* at 75:4–9.)

Defendant Rodriguez testified that while he was signing the waiver form or shortly after, Agent Lievers had the Defendant's wallet, opened it, and asked the Defendant who the children were in the pictures. (*Id.* at 65:7–14.) Defendant Rodriguez told him the names of his children, that he had a newborn child, and that Garza was their mother. (*Id.* at 65:16–21.) Defendant Rodriguez testified that Agent Lievers also was holding the wallet in one hand and Garza's driver's license in the other hand, twisting the license, and saying that "he had probable cause to arrest Monica Garza." (*Id.* at 65:21–66:4.) That statement, Defendant Rodriguez testified, "gave me very bad concern." (*Id.* at 66:9–13.) He said his reaction was that: "I was in trouble, or better

10

yet, I had my kids in mind and what were they going to think of me for me having my fiancé
arrested." (*Id.* at 66:6–8.)

The agents asked about Defendant Guzman. Defendant Rodriguez testified that he
answered that Defendant Guzman had stayed in a hotel the night before "because I didn't want
them to know what, that I stayed at my house or I was with Monica at the time, because I didn't
want her to be arrested." (*Id.* at 66:25–67:3.) The agents responded by saying that Defendant
Rodriguez was lying and that Defendant Guzman had already told them he stayed at Defendant
Rodriguez's house. (*Id.* at 67:8–11.)

Defendant Rodriguez acknowledged in his testimony that he did not tell the agents that
Defendant Guzman had stayed at his house until "after they, um, caught me in a lie." (*Id.* at
77:7.) The questions and testimony then turned to the issue of truthfulness and lying:

> Q   Oh, so you lied to the agents?
> A   Yes, Ma'am, I did.
> Q   How many times do you think you lied to them through the interview?
> A   I probably lied through the whole thing.

(*Id.* at 77:8–12.)

Defendant Rodriguez, in his testimony, admitted that he lied to the agents when he had
told them that Garza was his ex-girlfriend because, in fact, she was his current girlfriend at the
time of the arrest. (*Id.* at 67:19–68:4.) "I just told them that we were having trouble at the house
because of my drug addiction, and that is why I haven't been staying. They caught me in a lie, so
I just told them we did stay at the house." (*Id.* at 68:4–7.)

Defendant Rodriguez testified that the agents did not ask him about his involvement with
the marijuana operation. (*Id.* at 76:1–9.) He also testified that he told the agents he had a plan to
steal some of the marijuana. (*Id.* at 76:16–18.)

Defendant Rodriguez testified that he told the agents he was a drug addict. (*Id.* at 66:16–17.) During cross-examination, Defendant Rodriguez was asked whether he was under the influence of drugs during his interview with the agents.

> A:  Um, it was about a day that I wasn't using, but I was heavily using drugs.  And maybe it could have been still in my system. Yes, it was in my system.
> Q   What were you using?
> A   Ice, methamphetamine, cocaine.
> Q   All three drugs?
> A   Yes.
> Q   And how much do you think you might have used?
> A   Oh, I used heavily.  There was probably, I don't know, maybe in a day, I could use about a quarter of an ounce of meth and a quarter of an ounce of cocaine.

(*Id.* at 78:17–79:2.) The Defendant also testified that he has a previous felony conviction for possession of marijuana and that he has been arrested "plenty of times," "[m]any times," or a "ballpark" estimate of sixteen times. (*Id.* at 80:21–81:9.)

**C.     Testimony of Agents Cantu and Lievers**

**1.     *Encounter at the Restaurant***

Both agents testified that they did not attempt to interview any of the Defendants at the restaurant after the arrests and that no one else interviewed the Defendants at that time. (*Id.* at 9:8–11, 20:17–21, 34:15–18.) Agent Cantu qualified that statement by noting that, at the restaurant where several Defendants were arrested, Defendant Cuellar initiated a conversation with agents, claiming that he "was offering information to us, information as in he used to be a source for customs." (*Id.* at 21:7–9.) Agent Cantu testified that he told Defendant Cueller that they would talk later. (*Id.* at 21:11–14.) Agent Cantu did not attempt to interview anyone at the restaurant so none of the Defendants were read their *Miranda* rights at the restaurant. (*Id.* at

12

20:17–21, 21:22–24.) Agent Lievers said he told Defendant Rodriguez at the restaurant that the
Defendant was under arrest and that he was going to be taken to the Indiana State Police post.
(*Id.* at 47:19–48:2.) "I might have had a brief conversation with Mr. Rodriguez, but I do not
recall the contents of that conversation." (*Id.* at 85:5–7.) Agent Lievers said he did not intend to
interview the suspects at the restaurant because his intent was to clear the scene and drive to the
house where the marijuana was stored. (*Id.* at 85:8–14.) "As a case agent, I needed to get back to
the house, so I had no time to interview the individuals at the restaurant at that time." (*Id.* at
85:14–16.)

## 2.     *Preinterview Period at the State Police Post*

At the Indiana State Police post, the Defendants were all held in a conference room
before they were interviewed individually. (*Id.* at 45:11–19.) Agent Lievers was uncertain
whether the Defendants were handcuffed in the large room where they waited as a group. "I
don't recall, but I don't believe they would be cuffed. I do not recall, because I was not, I guess,
part of the security or the person there addressing those issues.  I was more on, I guess you
would say the interview part." (*Id.* at 87:16–19.)

Agent Lievers said he did not recall if the Defendants were given any food while they
were held together in a large room, but he also testified that they would have had the option to
drink from a water fountain and to use the restrooms. (*Id.* at 45:23–24.) Agent Lievers also
testified he could not recall whether they were actually given anything to drink. (*Id.* at 46:2–6.)
Agent Lievers testified that he and Agent Cantu were not in charge of providing food or water to
the Defendants before their interview. (*Id.* at 56:2–7.)

Monica Garza had also come to the agents attention based on "intelligence gathered prior to" the arrests. (*Id.* at 40:9–10.) Agent Lievers testified that he and Agent Cantu obtained a driver's license photo of Garza from the Indiana Bureau of Motor Vehicles. (*Id.* at 90:18–21.) Agent Cantu testified that he reviewed a criminal history check of Garza and looked at her photo before interviewing Defendant Rodriguez. (*Id.* at 23:4–13.) Agent Cantu testified that "[m]ost likely" he brought that photo to the interview with Defendant Rodriguez. (*Id.* at 23:18–19.)

### 3.    *Defendant Guzman's Interview*

The agents had learned about Defendant Rodriguez from their interview with Defendant Guzman, which took place before the interview with Defendant Rodriguez. Defendant Guzman had told the agents that Defendant Rodriguez or Monica Garza paid for Defendant Guzman's flight from Texas to Indiana, (*id.* at 13:21–22, 15:24–16:3), and that Defendant Guzman stayed at Defendant Rodriguez's house the night before the marijuana deal. (*Id.* at 13:17–23.) Agent Lievers testified that Defendant Guzman called Defendant Rodriguez by the nickname of "EJ." (*Id.* at 37:10–21, 15:24–16:1.)

Agent Lievers testified that he could not recall if he or Agent Cantu showed Garza's driver's license to any of the other Defendants during their individual interviews. (*Id.* at 88:13–21.) Specifically regarding Defendant Guzman, Agent Lievers testified that he did not recall if Garza's driver's license was shown to Defendant Guzman but that it could be a "possibility, and it could not be a possibility." (*Id.* at 89:16–24.)

Agent Cantu testified that he believes (but was not perfectly certain) that he and Agent Lievers showed an enlarged photocopy of Garza's license to Defendant Guzman. (*Id.* at

14

102:7–14.) "I don't recall but I want to say yes. I lean toward yes. . . . We wanted to find out

how, how she was involved in paying [Guzman's] plane ticket to get to Fort Wayne." (*Id.* at

102:10–11, 13–14.) However, Agent Cantu said that he and Agent Lievers did not possess

Garza's actual laminated driver's license. (*Id.* at 102:15–20.) Agent Cantu denied showing

Garza's license to Defendant Guzman or telling Defendant Guzman that he was going to arrest

Garza. (*Id.* at 93:10–17.) When counsel for the Defendant Rodriguez pressed Agent Cantu about

the matter, the agent said:

> I, I am almost certain that I did not tell him I was going to arrest Monica Garza.
> Q   As certain as you are that you might have had this driver's license when you were
> talking to Mr. Rodriguez, you just don't recall?
> A   I don't recall having that driver's license during the interview, sir.

(*Id.* at 93:22–94:1.) A moment later, Agent Cantu added that the driver's license "wasn't

produced" during the interview with Defendant Rodriguez. (*Id.* at 94:5–8.)

Agent Cantu also denied that the interview with Defendant Guzman was in Spanish; the

agent testified that they spoke in English. (*Id.* at 101:8–24.)


**4.   *Agents' Interview with Defendant Rodriguez***

The agents spoke to Defendant Rodriguez in English. (*Id.* at 36:25.) He was the third

Defendant interviewed by Agents Cantu and Lievers. (*Id.* at 11:17–23.)

Before the agents began questioning Defendant Rodriguez, Agent Cantu said he and

Defendant Rodriguez read each line of the English waiver of rights form together. (*Id.* at

15:9–11.) Agent Cantu testified that he followed his usual practice of reading each specific

sentence on the Miranda rights form along with the defendant, stopping after each sentence to

ensure the Defendant understands, and then at the end asking if the defendant understands and

wants to speak to the agents. (*Id.* at 27:6–18.) Agent Cantu made sure that Defendant Rodriguez understood each statement before Defendant Rodriguez signed at the bottom. (*Id.* at 15:6–14.) After that, Defendant Rodriguez agreed to talk to the agents, and the interview began. (*Id.* at 15:19–21.)

Agent Lievers testified that it is standard practice for ICE agents to review the advice of rights form with suspects before interviewing them, (*id.* at 85:17–19), and that they did so with Defendant Rodriguez, (*id.* at 85:20–22). Agent Lievers also testified that Agent Cantu showed Defendant Rodriguez the form, Defendant Rodriguez read the form, and Agent Cantu also read the rights to Defendant Rodriguez. (*Id.* at 38:9–11.) Agent Lievers testified that he was present when Defendant Rodriguez signed the waiver of rights form and that he, Agent Lievers, signed one of the witness lines. (*Id.* at 37:22–38:6.) Agent Lievers testified that neither he nor Agent Cantu signed the Defendant's name on the form. (*Id.* at 83:20–23.)

Agent Cantu said he began the interview by asking about Monica Garza. (*Id.* at 15:24–25:5). Even with Defendant Guzman's information about Garza buying an airplane ticket for Defendant Guzman, the agents did not know what Defendant Rodriguez's relationship, if any, was with Garza. (*Id.* at 15:24–25:5, 16:8, 12–15.)

Agent Cantu testified that Defendant Rodriguez told the agents that Garza was his girlfriend and that he had instructed her to use her credit card to pay for Defendant Guzman's flight. (*Id.* at 16:8– 11.) Then, according to Agent Cantu, Defendant Rodriguez made more incriminating statements, such as he knew he was involved in "a narcotics deal," (*id.* at 16:20–21), that he and others intended to receive a portion of the drugs in order to sell them, (*id.*

16

at 21–25), and that he planned to "rip off narcotics from Mr. [Guzman] and Mr. Cuellar once he received it." (*Id.* at 16:25–17:2.)

Agent Lievers testified that Defendant Rodriguez said his job was to be "a chauffeur for Mr. [Guzman]." (*Id.* at 86:11–13.) Agent Lievers testified that Defendant Rodriguez discussed his past drug use and addiction, knowing Defendant Hernandez, and the Defendant's plan to steal about 100 pounds of marijuana. (*Id.* at 39:11–17.) Agent Cantu testified that the Defendant never changed his account that his plan was to steal drugs from the other Defendants. (*Id.* at 19:18–21.) Agent Lievers testified that he did not recall Defendant Rodriguez stating that Defendant Guzman had stayed in a hotel. (*Id.* at 50:2–8, 86:14–16.) Rather, Agent Lievers testified that Defendant Rodriguez said that Defendant Guzman stayed at Defendant Rodriguez's house the night before. (*Id.* at 86:7–10.)

Agent Cantu testified that Defendant Rodriguez appeared to be somewhat uptight and reserved at the start of the encounter. (*Id.* at 24:8–9.) Agent Lievers testified that Defendant Rodriguez "was a little uptight a little bit about things," but that he was willing to talk to the agents. (*Id.* at 39:2–4.) Agent Cantu testified that Defendant Rodriguez appeared to be apprehensive "until we started with his relationship with Ms. Garza and the ticket. And then he, he seemed kind of relieved and began to open up and talk to us about the deal." (*Id.* at 17:5–8.) Both agents testified that Defendant Rodriguez expressed concern about the agents speaking with Garza because of her interest in pursuing a law enforcement career. (*Id.* at 17:20–18:2, 42:20–22.) Agent Lievers testified that Defendant Rodriguez "alleged that his girlfriend was looking into a possible career in law enforcement and did not want to jeopardize any potential that she might have had." (*Id.* at 42:20–22.)

Agent Cantu testified that Defendant Rodriguez did not get upset but instead "he felt bad, in my opinion. Actually, he actually told us that he felt bad that he was putting her through this. . . . [H]e just basically felt bad that he was bringing his girlfriend into this type of situation." (*Id.* at 18:13–17.) Agent Lievers testified that when the agents mentioned Garza to Defendant Rodriguez, "he acted a little bit nervous." (*Id.* at 41:23–25.)

> I believe that he, um, maybe, um, ashamed of what involvement possibly that she might have had. And he further explained, that is when he further explained the story and tried to defend how she was not involved, um, but that he asked her to purchase the ticket on his behalf. . . . He became very nervous. . . . [H]e did apologize . . . that Enedeo, though he did have a drug addiction, he was embarrassed about that. And then I think he was subsequently was embarrassed that again, his addiction led to, um, you know, possibly hurting his girlfriend.

(*Id.* at 42:1–5, 42:8–14.)

Agent Cantu testified that he and Agent Lievers told Defendant Rodriguez that they were going to speak with Garza regarding her involvement. (*Id.* at 18:5–6.) Agent Cantu testified: "We didn't know if she actually knew what was definitely going on, if she was actually involved in this narcotics transaction, this narcotics deal.  We did tell him we would have to speak with her at some point in time to find out what her involvement was." (*Id.* at 18:6–10.) But Agent Cantu denied using Garza to make Defendant Rodriguez talk, and the agent specifically denied that he threatened to bring Garza in for questioning, to have Garza arrested for having used a credit card to buy Guzman's flight, or to serve a search warrant on her residence. (*Id.* at 17:9–17, 24:14–24, 24:25–25:3.) Instead, Agent Cantu testified that they told Defendant Rodriguez "we would probably talk to her at a later point in time to figure out her involvement in this case." (*Id.* at 24:22–24.)

18

Agent Lievers said he did not recall threatening to use Garza or to obtain a search warrant for her residence in order to get Defendant Rodriguez to talk. (*Id.* at 43:2–11, 85:23–86:1.) He also testified that he did not mention anything to Defendant Rodriguez about a search warrant to search Garza's residence or probable cause to arrest Garza. (*Id.* at 48:3–7.)

Agent Lievers said the agents learned that Garza was the mother of one or more of Defendant Rodriguez's children from Defendant Rodriguez and not from Defendant Guzman. (*Id.* at 46:17–24.) Agent Lievers said he did not recall having Defendant Rodriguez's wallet in general or during the interview. (*Id.* at 47:1–7.) He also testified he did not recall showing photos of Defendant Rodriguez's children to Defendant Rodriguez. (*Id.* at 8–13.) Agent Lievers testified that Defendant Rodriguez mentioned his own children. (*Id.*) Agent Lievers testified that he never pressured the Defendant to talk by using his children, Garza, or pictures of them. (*Id.* at 86:2–6.)

Agent Lievers testified that he did not bring any of Defendant Rodriguez's personal items into the interview room. (*Id.* at 88:3–8.) Agent Lievers testified that Defendant Rodriguez's personal property, including his wallet, was confiscated when he was arrested and it was being processed as evidence by other officers. (*Id.* at 83:24–84:4, 84:14–17.) Agent Lievers testified that it is not his practice to bring personal items into an interview, (*id.* at 84:18–21), and he denied holding Garza's driver's license during the interview or showing the Defendant pictures of his children, as alleged by the Defendant. (*Id.* at 84:5–10, 84:22–24.) Agent Lievers testified that he did not recall having or using Garza's actual driver's license because it would have been confiscated as evidence, but he did recall that he had an enlarged photo of Garza from the Indiana BMV because of intelligence from before the arrest. (*Id.* at 90:13–17.)

19

When Agent Cantu was asked whether Agent Lievers held or manipulated Garza's driver's license during the interview of Defendant Rodriguez, Agent Cantu said: "I don't believe that that happened." (*Id.* at 91:23.) Agent Cantu also denied that photos of Defendant Rodriguez's children were shown to him to get him to talk. (*Id.* at 91:24–92:2.) He based these answers on, in part, the fact that all of the Defendants' personal items were confiscated when they were arrested and before the interviews. (*Id.* at 92: 5–8.) Agent Cantu testified that other agents removed and processed the Defendant's personal items. (*Id.* at 92:9-15.) When Agent Cantu was asked whether he and Agent Lievers had any of the Defendant's personal items during the interview, he said: "It most likely didn't happen. We didn't have anything, no." (*Id.* at 92:19–20.) Agent Cantu added that the driver's license "wasn't produced" during the interview with Defendant Rodriguez. (*Id.* at 94:5–8.)

The agents testified that they never did arrest Garza or get a search warrant for her residence. (*Id.* at 44:6–12.) Agent Lievers' first contact with Garza was at the initial hearing. (*Id.* at 44:13–14.) At that time, Garza told Agent Lievers that the van used during the marijuana deal belonged to Defendant Rodriguez's mother and that she needed it. (*Id.* at 44:18–25.) Agent Lievers testified that at that initial hearing he returned "the monetary instruments" recovered from Defendant Rodriguez during his arrest. (*Id.* at 44:24–25.) As of August 5, 2008, Garza had not been charged or indicted for any involvement with the marijuana deal.

Agent Lievers testified that Defendant Rodriguez did not appear to be under the influence of drugs during the interview because of the agent's past experience with persons on drugs as well as the Defendant's "clear and concise" answers. (*Id.* at 83:4–12.) When Agent Lievers was asked whether Defendant Rodriguez was truthful to the agents during the interview, Agent

20

Lievers testified: "Not with the conversation I had with him. I don't believe he is completely truthful 100 percent. I don't know if, directly if he made a lie, a misstatement. I don't know if he was completely truthful about his involvement in this case." (*Id.* at 48:10–13.)

Agent Cantu testified that Defendant Rodriguez did not appear hesitant during the interivew and never refused to answer any questions. (*Id.* at 19:14–17.) Agent Lievers testified that Defendant Rodriguez was responsive to the questions. (*Id.* at 37:1–3.) Agent Lievers testified that Defendant Rodriguez never appeared hesitant to answer any questions and never refused to answer any questions during the interview. (*Id.* at 43:24–44:5.)

The interview lasted about half an hour. (*Id.* at 19:9–10.) Agent Lievers testified Defendant Rodriguez did not ask for water or food during the interview. (*Id.* at 56:8–10.) Agent Lievers testified that Defendant Rodriguez and the other Defendants were not handcuffed during their individual interviews. (*Id.* at 50:9–16.)

Both Agent Cantu and Agent Lievers testified that they were armed during the interview but that each of their firearms were in concealed holsters such that Defendant Rodriguez could not see the weapons. (*Id.* at 18:18–19:5, 19:6–8, 43:15–19.) The interview was not electronically recorded.[3] (*Id.* at 25:23–26:3, 48:25–49:2.) The agents did not have Defendant Rodriguez review and then sign their notes to adopt them as his statement. (*Id.* at 26:7–12, 49:3–6.)

**D.      Court's Credibility Findings**

**1.      *Defendant Rodriguez's Credibility***

During cross-examination, Defendant Rodriguez admitted that he "probably lied during

---

[3] *Miranda* does not require that interviews or interrogations be electronically recorded. *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004).

the whole" interview with the agents. He also admitted that he told the truth to the agents only after they caught him in one or more lies, such as his false statement that Defendant Guzman had stayed at a hotel when in fact Guzman had stayed with Defendant Rodriguez at a residence. These admitted falsehoods make it difficult for the Court to believe any of Defendant Rodriguez's statements and especially those that are contradicted by the testimony of the agents.

Defendant Rodriguez's allegation that Agent Lievers was holding and turning Garza's driver's license is not only contradicted by the testimony of the agents but also is inconsistent with the standard practice, as described by the agents, of seizing and processing evidence. It is possible that the agents could have taken the license out of the evidence processing, but it does not seem likely.

The Defendant exhibited a nonchalant demeanor that was not consistent with a person being honest and forthright. His nonchalance was particularly pronounced when he admitted lying to the agents and when he discussed the number of times he had been arrested. Furthermore, during his testimony about being under the influence of drugs, it was evident to the Court that the Defendant was making up that testimony on the fly. It is also notable that this testimony was given during cross-examination and not during direct examination.

Defendant Rodriguez claimed that he was tricked into signing the waiver not only because of his supposed drug use but because of his "eighth-grade [education] level." A pretrial services report, however, indicates that the Defendant earned a general equivalency degree from Warsaw High School in Warsaw, Indiana. The Court is skeptical about the Defendant's claim that the signature on the waiver form (Govt. Ex. 1) is not his. It is very similar to the Defendant's signature on his driver's license (Govt. Ex. 5) and on his Indiana fishing license (Govt. Ex. 4).

22

Overall, the Defendant and his testimony did not bear the hallmarks of credibility, honesty, or truthfulness.

**2.      *Credibility of Agents Cantu and Lievers***

The two agents were forthright and straightforward in their testimony, rather than evasive or circumspect. Each agent's individual testimony was internally consistent, and each agent's testimony was consistent with the other agent's testimony.[4] Their accounts were reasonable and plausible. The agents' explanation for why they asked about Garza, and their statements that they brought an enlarged photo of her but not her driver's license, are reasonable and plausible.

While it is theoretically possible that they duped and/or coerced Defendant Rodriguez into signing away his rights, such trickery and pressure seem implausible. By the time the agents interviewed Defendant Rodriguez, they already had collected a significant amount of incriminating evidence against Defendant Rodriguez and the other Defendants. In other words, their case did not hinge on getting Defendant Rodriguez to talk.

Overall, the agents and their testimony were credible.

**3.      *Court's Findings***

Because the Court finds that Defendant Rodriguez and his testimony are not credible and that the ICE agents and their testimony are credible, the Court makes the following findings:

---

[4] Their testimony during the October 2007 hearing also was consistent with their testimony during the January 2008 hearing for Defendant Guzman's motion to suppress. For example, both agents testified at that hearing, like they did at the October hearing, that Agent Cantu followed his typical practice of reading each sentence of the "Rights" form with a defendant and then asking the defendants if they understand. (Jan. Hr'g Tr. 26:8–17, 30:20–31:9, 38:15–20.)

23

- the agents did not bring Garza's driver's license to the interview with Defendant

Rodriguez, and Agent Lievers did not hold and turn the license while interviewing

Defendant Rodriguez in order to pressure or coerce him;

- the agents did not threaten to arrest Garza, take her into custody for questioning, or

search her residence (with or without a search warrant);

- Defendant Rodriguez was not under the influence of drugs at the time of the interview;

- Agent Cantu fully explained the *Miranda* rights on the waiver form to Defendant

Rodriguez, and Defendant Rodriguez indicated that he understood the rights and the

consequences of waiving them;

- Defendant Rodriguez signed the waiver form and was not coerced into signing; and

- the agents did not interrogate or interview, or attempt to interrogate or interview,

Defendant Rodriguez at the restaurant.


## LEGAL CONCLUSIONS

### A.   **Defendant Rodriguez's *Miranda* Waiver Was Knowing, Intelligent, and Voluntary**

Whether Defendant Rodriguez's waiver of his *Miranda* rights was valid depends on a

crediblity determination: who to believe on the issues of whether the waiver was voluntary and

whether it was done knowingly and intelligently.

Because the Court believes the agents' testimony and does not believe Defendant

Rodriguez's testimony regarding the allegations of coercion by making threats to arrest Garza or

search her home, or by holding Garza's driver's license, the Court concludes that Defendant

Rodriguez's waiver of *Miranda* rights "was the product of a free and deliberate choice rather

24

than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Because the Court believes the agents and does not believe the Defendant regarding the Defendant's claim that he was under the influence of drugs, tricked by the agents, and did not understand what signing the form meant because of his education level, the Court concludes that the waiver in this case was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Therefore, the Court concludes that Defendant Rodriguez's waiver of his *Miranda* rights was valid and effective.

**B.      The Defendant's Statement Was Voluntary**

The Court concludes that the Defendant's incriminating statements to the agents were voluntary and not coerced for several reasons. First, as explained above, the Court disbelieves the Defendant's claims that the agents coerced him by threatening Garza.

Second, the factors and circumstances courts are to analyze do not suggest that his statements were involuntary. Defendant Rodriguez's age (twenty-seven years old at the time) and his educational background (he has a general equivalency degree) do not suggest coercion. *United States v. Spruill*, 296 F.3d 580, 589 (7th Cir. 2002) (thirty-four-year-old suspect with ninth-grade education and a high school equivalency certificate knowingly waived his *Miranda* rights); *Stawicki v. Israel*, 778 F.2d 380, 382–84 (7th Cir. 1985) (twenty-three-year-old suspect with high school equivalency certificate and average intelligence knowingly and intelligently waived his *Miranda* rights). His numerous arrests indicate he has some experience with police and the tactics they employ to get information from defendants. There is no believable evidence or testimony that his mental state was anything but normal during the interview. The length of

25

detention until his interview was about four hours, not an extreme amount of time, and the interview was only about thirty minutes. There was nothing unusual about the nature of the interrogation, which took place at an Indiana State Police post. The fact that two other Defendants had already been through their interrogations means the Defendant can hardly claim surprise that he was questioned. The agents' firearms were not visible during the interview. The Court has already established that the Defendant was explicitly informed of his constitutional rights by a line-by-line reading of the waiver form. There is no allegation or evidence of physical coercion. In conclusion, none of the factors or circumstances suggest that the Defendant was coerced and made involuntary, incriminating statements.

**C.      Alternate Basis for Conclusion that Defendant Rodriguez Voluntarily Signed the Waiver and Voluntarily Made Incriminating Statements**

Even if the Court believed all of the Defendant's allegations about coercion (threats to arrest Garza, threats to search her residence, Agent Lievers holding her driver's license), that conduct still would not rise to a level of coercion that makes his waiver or statements involuntary and ineffective or inadmissible.

First, a threat to arrest Garza or search her residence would not be "objectively unwarranted," *United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), given that the agents had learned that Garza bought Defendant Guzman's ticket and Defendant Guzman may have stayed at her house the night before. Such a true statement would not make the resulting confession involuntary. *Id.* Under this scenario, Defendant Rodriguez might have had "rightful concern," *United States v. Santiago*, 428 F.3d 699, 705 (7th Cir. 2005), that authorities would arrest or detain Garza or search her residence in light of what the agents had discovered, but that

26

is not "psychological pressure" that makes a resulting confession involuntary. *Id.*; *United States v. Johnson*, 495 F.3d 536, 542 (7th Cir. 2007.)

Also, the alleged conduct of the agents does not rise to an extreme level that calls for exclusion of the Defendant's statements. What the Defendant alleged happened here falls well within the spectrum of police conduct that the Seventh Circuit has said is not coercive enough to warrant declaring the resulting statement to be involuntary and inadmissable.[5] The Defendant did not provide any Seventh Circuit case where the court ruled that police coercion caused an involuntary confession. In *Santiago*, however, the Seventh Circuit contrasted its facts with those of another circuit's case, *United States v. Ivy*, 165 F.3d 397 (6th Cir. 1998), where the court found coercion because for an hour and a half police threatened to arrest the defendant's girlfriend and take their child; they kept the girlfriend shackled to a table; the child was taken from his mother's arms; and police repeatedly requested consent to search. *Ivy*, 165 F.3d at 404, *cited in Santiago*, 428 F.3d at 705. *Ivy*, and the cases provided by the Defendant where the courts found coerced confessions, are too dissimilar to this case to be of any help.[6]

Given that the agents' alleged conduct would not have made the Defendant's resulting

---

[5] *See, e.g.*, *United States v. Miller*, 450 F.3d 270, 272–73 (7th Cir. 2006) (ruling that police statement that they would arrest the defendant and his girlfriend was true because they had probable cause and therefore did not make the defendant's subsequent confession involuntary); *Santiago*, 428 F.3d at 704–05 (ruling that comments from police that may have made the defendant think about the consequences for his family if he did not consent to a search did not make consent involuntary, defendant realized a search of his home was likely, and defendant was rightfully concerned that his girlfriend could be connected to his drugs); *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990) (defendant's confession was voluntary even though police detective said he did not know if defendant's fiancé would be charged when in fact he knew that the fiancé would not be charged); *United States v. Welsh*, 721 F.2d 1142, 1144 (7th Cir. 1983) (ruling that, even assuming an officer said the situation "looked awfully bad for" the defendant's loved one, such a view was obvious to the defendant, and it presented a difficult choice but not a coercive situation).

[6] The Defendant cited *United States v. Moreno*, 891 F.2d 247 (9th Cir. 1989) (crying defendant and daughter separated and daughter put in handcuffs), and *United States v. Finch*, 998 F.2d 349 (6th Cir. 1993) (police with guns drawn threatened to arrest defendant's mother and female companion). (Def. Br. in Supp. of Mot. to Suppress 7–8.)

statement involuntary, that same conduct also would not have made the Defendant's waiver of his *Miranda* rights involuntary.

## CONCLUSION

The Court concludes that Defendant Rodriguez's waiver of his *Miranda* rights was done knowingly, intelligently, and voluntarily, and that his statements to the agents were voluntary and not coerced. Therefore, the Defendant's Motion to Suppress [DE 103] is denied.

So ORDERED on August 6, 2008.

   s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT